**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 1:09-cv-23222-KMM

U.S. HOLDINGS, INC., a Florida corporation,

       Plaintiff,

v.

SUNTRUST BANK, a Georgia corporation,
and SUNTRUST ROBINSON HUMPHREY,
INC., a Tennessee corporation,

       Defendants.
_____/

## SECOND AMENDED COMPLAINT

    Plaintiff, U.S. HOLDINGS, INC., through its undersigned counsel, sues Defendants SUNTRUST BANK and SUNTRUST ROBINSON HUMPHREY, INC., and as its Second Amended Complaint, states:

## JURISDICTION AND VENUE

    1.    This Court has diversity jurisdiction over this lawsuit pursuant to 28 U.S.C. §1332 as it is brought between the Plaintiff and Defendants who are citizens of different states, as stated below.  The amount in controversy exceeds $75,000, exclusive of interest, costs and attorneys' fees.

    2.    Venue is proper in this district as most of the acts complained of below, including the critical acts giving rise to the claims pled in this lawsuit, occurred in this district, as did the sale of securities to the Plaintiff by Defendants.  Further, Plaintiff maintains its principal place of business in this district and Defendants each maintain material executive business offices in this district. Finally, venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

3.     Plaintiff U.S. Holdings, Inc. ("USH"), is a Florida corporation with its principal place of business located in Hialeah, Florida.

4.     Defendant SunTrust Bank ("SunTrust") is a Georgia corporation headquartered at 303 Peachtree Street, N.E., Atlanta, Georgia 30308. SunTrust provides investment, banking, financial, advisory and asset management services to its business clients, such as and including USH.

5.     Defendant SunTrust Robinson Humphrey, Inc. ("STRH"), a wholly-owned subsidiary of SunTrust, is a Tennessee corporation headquartered at 303 Peachtree Street, N.E. Atlanta, Georgia 33308.  STRH is a broker-dealer and investment adviser registered with the Securities and Exchange Commission ("SEC") and FINRA. STRH was established in 2007 by merger of SunTrust Capital Markets, Inc. and The Robinson-Humphrey Company, two divisions of SunTrust that provided various securities brokerage, investment banking, research and debt capital markets services.

## NATURE OF THE ACTION

6.  USH brings this action to recover damages or for rescission, respecting its purchase of certain securities through SunTrust and STRH, that were falsely represented to USH as being very short term instruments, meaning 7 to 35 day notes, but which turned out to be long term bonds with maturities of 20 or more years, traded through an auction process. These securities are now commonly known as auction rate securities or "ARS" and as described below, the auction market for these ARS collapsed in February 2008, leaving USH in a position of suddenly and surprisingly finding it held $14,800,000 in long term illiquid bonds with no market for resale, instead of highly liquid short term notes.  USH seeks to recover damages against Defendants for selling these ARS to USH in breach of their fiduciary

duties, through fraud and other common law torts, and in violation of Florida state securities laws.

**GENERAL ALLEGATIONS**

**A FIDUCIARY DUTY IS ESTABLISHED BY SUNTRUST IN FAVOR OF USH**

7.    USH was founded in 1916 by Alex DeBogory, Sr. as a company specializing in bicycle repair. Over the years, through its prudent management and continual reinvestment back into the company, it has grown to be a major manufacturer for the underground contracting industry. It remains a family owned business today, with three generations of the DeBogory family still engaged in the business, having now grown to a company with five affiliated businesses and physical facilities in six states.

8.    Part of USH's corporate culture has been to practice the highest degree of integrity in everything it does as an organization, starting and ending with how it builds, develops and maintains loyal and strong relationships, whether it be with its employees, customers, vendors and professionals, which in this case, includes its bankers.

9.    For a period of approximately 20 years, USH had maintained an excellent banking relationship with Southeast Bank, until such time that the bank failed and was taken over by federal regulators. After that, USH advised First Union Bank (the successor to Southeast Bank) that it could retain USH's business, subject to First Union keeping the same personnel on USH's account that had serviced USH while employed by Southeast Bank, given USH's established comfort level and relationship with those employees.

10.    Starting in or about 1995, representatives of SunTrust started calling on USH senior management, requesting the opportunity to serve as bankers for USH. At first, USH was resistant to changing its bankers, being satisfied not just with First Union, but also, with the

quality relationship established with individuals servicing USH, going back years to their prior employment with Southeast Bank.  However, in a professional and respectful way, for approximately a four-year period, certain senior SunTrust officers, Nic Bustle, Trish Castellanos and Tom Cornish ("Cornish"), (who was president of the Florida region of Sun Trust) stayed in front of USH senior management, continually making suggestions and rendering business advice on how USH could streamline and make more efficient its various bank accounts and save money on banking services.  Finally, when USH's standing line of credit expired pursuant to its terms at First Union, USH decided that SunTrust had earned the opportunity to become its bankers.

11.     From the beginning of when SunTrust assumed responsibility over USH's banking needs as well as virtually all of its financial affairs, except for accounting and tax functions, a relationship of deep trust, dependence, confidence, counsel and reliance was placed in and existed with SunTrust by USH, such that a fiduciary relationship was established.  Developing this fiduciary relationship was consistent with the personal marketing made to USH by SunTrust's officers, combined with Sun Trust's printed public advertising about its high level commitment to its clients.  The depth of this trust, dependence, confidence, counsel and reliance by USH with SunTrust, was no different than the depth of USH's similar reliant relationships that existed with its lawyers and accountants.  To be sure, SunTrust was not only aware of USH's heavy reliance, dependency upon and trust in SunTrust, but SunTrust consistently did everything it could to substantiate that trust by continually counseling USH on the financial matters described below and thoroughly infusing itself into USH's financial affairs.

12.     USH has grown and survived in business for nearly a century largely because of its consistent conservative philosophy of carefully watching its cash management in all phases of

its business, and retaining the earnings of the company for contingencies and to take advantage of growth opportunities when presented.  This fact was relayed to SunTrust from the time of the first visits to USH by Mr. Bustle, Ms. Castellanos and Cornish, and USH has never strayed from that philosophy through the duration of its relationship with SunTrust. Predicated on that philosophy, examples of the depth and dependency of the relationship between USH and SunTrust, just related to the critical cash management issues, which went well beyond the typical bank and customer relationship, and for which SunTrust counseled USH and then received additional fees, include but are not limited to:

(a)     Providing a "Positive Pay" service to assist USH in its auditing process by providing a list of checks submitted for payment on a daily basis, so SunTrust could cross-reference and balance against it, which thereby helped USH better manage its cash flow, as well as providing an anti-fraud component.

(b)     Given the large number of USH related companies and accounts, SunTrust installed a "Concentration Account," whereby all cash balances could be consolidated and drawn upon by each USH wholly owned subsidiary.  USH had the ability to internally track cash receipts and payments in order to make sure each company had the correct cash balances.  Shortages in any one company could be offset against overages in another company with internal loans to prevent external borrowing or "NSF" charges.

(c)     SunTrust installed a "Controlled Disbursements" procedure whereby SunTrust gave USH notice of checks that were to clear the next day.  This helped SunTrust counsel USH on making better decisions about how much money was available to invest overnight and increased the amount of funds available for investment.

5

(d)     SunTrust regularly counseled USH on all facets of cash management, ranging from daily operations and investments, to funding for major equipment or facility acquisitions.

(e)     To keep better control over its free and excess cash at the end of each business day, including new deposits, SunTrust established an "Overnight Sweep Investment Program."  Under this program, a representative of SunTrust spoke with USH on a nearly daily basis to counsel USH in the best means of investing USH's excess funds, consistent with USH's conservative investment philosophy and specific investment criteria.

The end objective of all of these cash management services was to provide USH with a better opportunity to increase its cash for catastrophic events and business opportunities and long term conservative corporate financial planning.

13.     Undoubtedly, the depth and level of trust, confidence and dependency USH placed in SunTrust was not limited just to the special cash management services and counseling on cash management issues raised above. Once USH saw the results of the special cash management services SunTrust provided to USH, along with the beneficial counseling and advice rendered by SunTrust on other cash management issues, as referenced above, it felt secure enough to allow SunTrust to expand the relationship further.  Hence, with the exception of pure accounting functions, virtually every other financial aspect of USH's business became tied up with SunTrust, making USH extremely dependent upon and fully intertwined with SunTrust, while at the same time, again providing SunTrust with additional fee opportunities.  Actual examples of this close, entangled relationship where Sun Trust took on extra services, providing it with a greater economic benefit than its normal depositor client include, but are not limited to:

(a)     Every USH bank account was maintained at SunTrust, including their disbursement, payroll and depository accounts.

(b)     USH kept in place a $10 million general business line of credit at SunTrust to assist in covering catastrophes or other business needs at low interest rates, whereby USH's interest rate was the prime rate <u>less</u> 1.75%, unsecured, showing the strength of the relationship.

(c)     USH executed a Master Operating Lease with SunTrust for most of its capital equipment needs, primarily rolling stock, such as forklifts and the like.

(d)     SunTrust provided to USH a credit enhancement (effectively a guaranty) and transaction structure advice for two Industrial Revenue Bonds for USH facilities located in Hialeah and Utah.

(e)     SunTrust counseled USH on problems it saw with USH's 401k program in place for all USH employees, which USH was unaware was being mismanaged by Morgan Stanley. Heeding SunTrust's counsel: it moved all management of the 401k program to SunTrust who then recommended additions and deletions from the fund, changes to the plan design, investment of all 401k funds and monitored same, provided USH with a watch list on certain funds and held quarterly meetings at USH about plan status and fund performance issues.

(f)     SunTrust provided USH with corporate credit card processing for its customers that averaged approximately $1 million of sales per year.

(g)      Every quarter, SunTrust visited USH offices for the purpose of assisting USH employees in opening up personal checking accounts at SunTrust.

(h)     Following Hurricane Wilma when there was no electric power for much of South Florida, a USH subsidiary had a generator that provided only enough power to run its computer to process payroll and invoicing.  While power was out, SunTrust's primary account representative visited USH's offices every other day, bringing ice and food for USH employees, which further enhanced the relationship.

14.     The foregoing two paragraphs demonstrate that this was not just a simple bank/customer, debtor/creditor relationship.  Rather, it was a relationship where: (i) SunTrust was infused deeply into virtually all financial affairs of USH, with SunTrust providing some special services to USH, (ii) a significant effort was made by SunTrust to develop great trust with USH, (iii) SunTrust actually assumed the role as counselor, giving material advice to USH which it relied upon in matters such as cash management, transaction structure, account usage, 401k plan administration, and most importantly as it pertains to this lawsuit, investment advice. Each of the foregoing items also provided additional and often, significant fee opportunities to SunTrust.

15.     A critical factor in demonstrating the depth of the fiduciary duty that existed in SunTrust by USH, was that in or about July 2005, USH became trusting enough in the overall relationship with and the counsel that had been given by SunTrust to that point, to move all of its funds to SunTrust.  Even before that point in time, going back to 2001, SunTrust expressly sought to undertake the responsibility of serving as USH's sole investment advisor and broker, and The Investment Advisers Act of 1940, 15 U.S.C.A. §80b-1 et seq. and SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180 (1963) provide that an investment adviser has a fiduciary duty to its clients.  In fact, USH's loan agreement with SunTrust required USH, as an affirmative

covenant, to maintain all of its accounts and money at SunTrust, thus virtually assuring that SunTrust would have full and complete responsibility for counseling USH and investing its money.  And at that time, allowing SunTrust to assume that enhanced level of responsibility made sense to USH since SunTrust successfully had undertaken so many other acts of assistance to USH in managing its cash and was so deeply infused in all of USH's financial matters.

16.    Additionally, SunTrust was acutely aware of USH's conservative investment philosophy, including with respect to its conservation of cash, since that was how USH operated from the moment SunTrust first met with USH through present day.  Thus, in fact, during the entire period that SunTrust served as USH's investment advisor, SunTrust bought and sold as much as $100 million in securities for USH, and for which SunTrust was paid very significant fees or commissions, much of it undisclosed, as described below.  During this time, USH did not purchase a single security through any other entity, and literally every single purchase and sale was recommended to USH by SunTrust.  Further, while USH management felt it was very good at handling its own internal business, accounting and financial affairs, that expertise did not extend to the selection, purchase and sale of securities for USH business purposes.  In fact, USH had no employee trained in the securities field employed by the company.  Indeed, all of the senior USH officers even used securities professionals for their own personal investments as well.

17.    SunTrust also cultivated the closeness of the relationship between it and USH to a personal level with the three senior officers of USH, Alex DeBogory, Jr., Alex Lane DeBogory and David Brunswick.   At SunTrust's urging, these individuals also kept virtually all or almost all of their private money at SunTrust, using its private banking services, including in regular banking and securities accounts, and SunTrust provided a number of sophisticated investment

counselors to them.  SunTrust even counseled at least one officer on long term financial and estate planning.  In fact, consistent with USH's conservative financial philosophy described in paragraph 13 above, the officers' personal accounts also show an aversion to debt and very conservative investment philosophies, without exception.

18.     The substance, strength and evidence of SunTrust assuming a fiduciary relationship with USH is not just evidenced by the responsibilities it willingly assumed as described above, but is also part of SunTrust's corporate creed.   For instance, in the "SunTrust Code of Business Conduct and Ethics," a document circulated to all SunTrust employees, SunTrust instructs its employees that they have a fiduciary duty to their customers.     For instance, at page 1, being a memo to all SunTrust employees, L. Phillip Humann, Chairman, President and Chief Executive Officer writes, "*Clearly, as we pursue our individual job responsibilities, we must always comply with applicable laws and regulations.  But at SunTrust, "integrity" has always meant more than that.  It also means **handling the affairs of our customers with the utmost care**...*"  At page 9, the SunTrust Code of Business Conduct and Ethics admits, **"*SunTrust has various fiduciary obligations to customers ...*"** (emphasis added).  USH is also informed and believes that SunTrust's written conflict of interest policy contains an acknowledgement that it owes its clients a fiduciary responsibility.

19.     Further, SunTrust publicly tells its business "clients" that it owes them a fiduciary duty in its magazine, *Solaris*.  In its Winter 2005-2006 edition, William R. Reed Jr., Vice-Chairman, wrote at page 2, in part, *"At SunTrust, we are deeply committed to understanding your business and personal goals, and to helping you achieve them.  We know that having access to comprehensive financial solutions is critical, but that's just part of the equation.  You also need advisors who understand how you define success and who recommend the right solutions at*

*the right time to help you truly prosper. … In short, this edition of Solaris is just one small reflection of our desire to be here as your advisor, partners and ally as you address today's challenges while keeping a keen eye on the future."*

20.    USH specifically alleges that Cornish, who served as Executive Vice President and Corporate Banking Divisional Manager of Sun Trust at the time USH became a customer of SunTrust and thereafter (and later became Miami City President and Executive Vice President for the South Florida Region in charge of Commercial Banking), will attest to facts respecting the relationship between Sun Trust and USH that incorporates both his vast banking experience, particularly as a "corporate banker" and the perspective of being one of the principal representatives of SunTrust responsible for bringing USH into the bank. Cornish's factual position is that when the corporate banking relationship between Sun Trust and USH was being developed,  (i) he and others, including Nic Bustle and Trish Castellanos, worked to develop and position Sun Trust as a strategic advisor to USH which meant special trust and confidence existed between Sun Trust and USH that went well beyond the typical bank customer relationship, and this advisory approach was typical of the philosophy embraced by the corporate banking team at Sun Trust, (ii) this corporate banking relationship included counseling or being involved in USH business plans, capital structure and cash management, debt structure, valuations and its investment portfolio, (iii) he knew USH placed trust and confidence in Sun Trust and relied on the bank to so counsel it, (iv) the corporate culture at Sun Trust and what it was selling to all of its corporate banking clients, such as USH, was this broad advisory relationship which transcended the standard bank/depository or simple loan customer relationship, (v) the USH relationship only grew stronger the longer it continued and the more that SunTrust provided additional special services to USH, including consulting on the purchase

and sale of securities through STRH and serving as its securities broker.  Cornish will also attest that he specifically knew and it was common knowledge to those officers at Sun Trust who worked with USH, that USH was a fiscally conservative company and risk adverse in making securities investments.  Further, Cornish believes that USH had always maintained its investment portfolio in securities with a high degree of liquidity and low risk and that this portfolio was maintained to ensure the company had adequate short-term liquidity to take advantage of any cash needs or corporate investment opportunities.   Cornish believes USH's philosophy on this was well known to all SunTrust officers involved in the relationship, and the investment in securities that did not match their needs for short term immediate liquidity would have been highly inconsistent with the company's long established conservative philosophy.

21.    Thus, for a period of 10 years preceding the filing of this lawsuit, SunTrust served as far more than just a repository for deposits or as a commercial lender making an occasional loan.  As explicated above, SunTrust expressly wished to be involved with USH in an all-encompassing relationship, where it was totally infused in virtually all aspects of USH's financial affairs, and that is exactly what happened.  USH heavily relied upon and reposed its full trust and confidence in SunTrust's counsel and services.  In reality, this high degree of trust and confidence that USH reposed in SunTrust based upon the various areas of counsel given and special services provided, was every bit as significant as the trust and reliance USH placed in its accountants and lawyers.  In sum, SunTrust requested this responsibility, and then embraced that it owed a fiduciary duty to USH, which existed for the duration of the parties' relationship.

## SUN TRUST ROBINSON HUMPHREY

22.    At all times material hereto, while a separate corporate existence between SunTrust and STRH apparently technically existed, there was no factual disclosure distinction to

USH about STRH being anything but SunTrust Bank.  On the contrary, in SunTrust's marketing for itself and other business units such as STRH, front and center on each marketing piece is the trade name and logo "SunTrust." Additionally, the SunTrust website serves as the host for a direct link to STRH.  SunTrust and STRH also maintain their corporate headquarters together at 303 Peachtree Street, N.E. Atlanta, Georgia 30308.

23.     Specifically as to USH, even as to the maintenance of USH's securities accounts, SunTrust and STRH were inextricably intertwined. Numerous securities related statements, such as trade confirmation slips, only bear the name SunTrust, and not STRH.  SunTrust also placed USH with STRH.  Following that, SunTrust then assigned one of its Vice-Presidents, Dave DeBasio ("DeBasio"), to oversee and manage USH's cash management account, which effectively made DeBasio the securities advisor to USH.   Initially, DeBasio was physically located in SunTrust's Miami banking offices, with a SunTrust phone, SunTrust business card and SunTrust e-mail address, which he retains today.

24.     For most of the duration of USH's relationship with SunTrust, DeBasio counseled USH in investing its free cash.  DeBasio may have become a STRH employee after SunTrust's acquisition of Robinson-Humphrey in 2007, but he continued working out of SunTrust offices, using its name, resources and equipment.   Further, even after the Robinson-Humphrey acquisition and use of the STRH name, neither DeBasio nor any other employee of SunTrust ever discussed or disclosed anything to USH that distinguished or demonstrated a separate corporate existence between the two entities.  In fact, at all times relevant hereto, DeBasio had direct access to USH's account balances at SunTrust and reviewed same on his own, for purposes of ascertaining whether or not USH had excess funds to invest.  Indeed, USH never once met a single other employee of STRH, and in virtually every meeting USH held with

DeBasio, another representative of SunTrust was present, typically USH's primary account representative at SunTrust.  Additionally around June 2008, DeBasio transferred to SunTrust's Nashville, Tennessee office.  After his move, another SunTrust or STRH employee in Miami was assigned to serve as investment counselor for USH.  However, USH was unhappy with the quality of service provided by that person and contacted its account officer at SunTrust, who caused DeBasio to be put back onto the USH account based upon the trust he had established with USH, even though he was in Tennessee.  The foregoing facts support USH's understanding that it was dealing with one entity, SunTrust, not a second company STRH.  Notwithstanding and alternatively, SunTrust was the principal and STRH was its agent in STRH's limited dealings with USH, and SunTrust was and is a control person of STRH.

### USH OPERATED IN A CONSERVATIVE FINANCIAL MANNER, INCLUDING IN MAKING ITS INVESTMENTS

25.    A significant reason USH has grown in good times and survived in bad times for nearly a century, has been its consistent management philosophy of practicing conservative cash management, passed down through the generations of DeBogory family ownership of USH.  For example, USH has very seldom taken on debt to finance its operations and has intentionally accumulated its cash so as to be able to survive economic downturns.  For over 50 years, USH's financial philosophy was to keep significant corporate earnings in the company as cash reserves, to assure that during difficult economic times, the company: (i) would not have to borrow money for operations (which would raise debt service), and (ii) could have cash available for acquisitions and to take advantage of opportunities for equipment and other purchases.  That was the principal, critical reason why SunTrust's focused cash management activities were so important to USH's financial business plan and health.  SunTrust was not only completely aware

of this fact, but it counseled and worked with USH on every aspect of its cash management needs and issues, so that this objective could be securely assured, as described in detail above.

26.    Thus, one of the most important functions SunTrust performed for USH was assuring that consistent with USH's philosophy of accumulating cash and investing same conservatively, on about a twice a week basis, if not more frequently, SunTrust, and specifically DeBasio, counseled USH on how to accumulate and invest its cash.  This is evidenced not just by the items articulated in paragraph 13 above, but by actual counsel given by SunTrust in how to manage and safely invest its money to assure its cash management objectives were met. Having DeBasio available to actually counsel USH on all aspects of investment matters was very important to USH, because while USH is very good at understanding its business of manufacturing for underground construction, it also has long known that it is unsophisticated in issues of investing its money, which requires special expertise and knowledge, such as that which SunTrust and DeBasio offered.

## SUNTRUST STARTS SELLING ARS TO USH

27.    Starting in or about 2002 through present day, USH principally assigned its Assistant Credit Manager, Gary Bond ("Bond") to work with SunTrust and DeBasio in investing its cash.  In fact, it was DeBasio who taught Bond the nuances of daily cash management.  Bond had no independent decision-making authority to select investments for USH.  Rather he was provided standard and standing explicit instructions regarding security and liquidity requirements of investments, which were communicated by Bond to DeBasio at each conversation, and which DeBasio acknowledged.  At all times pertinent hereto, but even long before 2002, USH never strayed from its clearly articulated investment criteria that any and every single investment be: (i) safe, (ii) very short term, (iii) liquid, and commensurate with but subservient to these three

primary criteria, (iv) carry the best interest rate available.  With respect to these "investment criteria," the importance of the investment's safety and short term nature was far more important than the issue of making a few more basis points on a particular investment, since virtually always, short term investment securities pay lower interest rates than long term investment securities.  This meant that typically, USH was interested in purchasing investment securities that were AAA rated, carried some type of credit enhancement with them (such as guarantees or letters of credit), and were redeemable in periods of 7, but almost always 35 days.  Once these investment criteria were met, by the nature of the opportunities in the securities markets, USH could only earn a few more basis points than was offered compared to buying short term CD's or the like.

28.    The process of SunTrust investing USH funds was always the same respecting its purchase of  what USH believed were short term instruments, but which turned out to be long term ARS bonds that were merely rolled over from auction to auction.  It was materially predicated on the excellent and trusting relationship DeBasio cultivated with USH, the foundation of which was his expertise and counsel to USH, combined with the stability of DeBasio knowing and understanding USH's investment criteria, as described in the preceding paragraph.

29.    Based upon the investment criteria described above, as to the purchase of each ARS now in issue, which covers the time period of March 2006 through the collapse of the ARS auction market in February 2008, the process for effecting each transaction was the same. In essence, in conjunction with the Overnight Sweep Investment Program SunTrust instituted for USH, when funds were available in an amount sufficient to invest, Bond typically would call DeBasio and advise him of such and restate USH's aforementioned investment criteria.  DeBasio

then consistently verbally reaffirmed the criteria to Bond, stating to the effect, "I know your position on needing an appropriate short term cash instrument and here's what's available." DeBasio would then lay out the choices of what allegedly short-term, liquid securities were available (and which turned out to be the long-term ARS) and make a recommendation. In every one of these telephone calls, DeBasio never once advised that any of these securities were in fact, long term ARS.  Nor did he disclose to USH that an auction market for the ARS existed, how the ARS worked, or that SunTrust was an active participant in the ARS auction market.  In fact, there was never once a conversation where DeBasio ever once explained ARS to Bond or anyone else at USH.  On the contrary, when DeBasio would discuss making an investment with either Bond or very occasionally, with another USH employee, Kingsley Bewley ("Bewley"), he would say, "I have the following short term cash instruments available…" which specifically referenced the ARS referenced below, and he always indicated USH's money would be safe and liquid should USH purchase that security. For each such telephone call and ARS purchase, Bond was physically located in his office on a telephone speaking directly with DeBasio, who was located in his office at SunTrust.

30.    This process and the content of the telephone conversations between Bond and DeBasio referenced immediately above occurred for and at the time of the purchase of each of the following ARS securities as follows:

(a) On March 6, 2006, Michigan Student Loan Authority, Series 2002 XVII – H5, Cusip No. 594520HZ4 in the in an initial principal amount of $2,000,000, with an additional purchase of these bonds of $100,000 on November 6, 2006 and $2,000,000 on June 26, 2007;

(b) On January 24, 2007, Vermont State Student Assistance Corporation, Series 2003 KK, Cusip No. 92428CES9 in the principal amount of $2,000,000, with an additional purchase of these bonds of $100,000 on October 11, 2006 and $2,000,000 on July19, 2007;

(c) On July 19, 2007, South Carolina Student Assistance Authority, Series 2002 K-2, Cusip No. 837114GF8 in the principal amount of $3,000,000, which were redeemed to the extent of $400,000, such that USH still holds $2,600,000 of these bonds;

(d) On July 19, 2007, North Carolina State Educational Assistance Authority, Series 2002 K-2, Cusip 658262DH0 in the principal amount of $3,000,000;

(e) On August 7, 2007, North Carolina State Educational Assistance Authority, Series 2007 S-1, Cusip 658262EK2 in the principal amount of $1,000,000.

31.    USH submits that every single current and former SunTrust employee involved or familiar with USH, starting with DeBasio and including but not limited to Nic Bustle, Trish Castellanos, Cornish and Sanja Shank (a SunTrust account officer who handled USH), would agree that USH: (i) always practiced extremely conservative cash management, (ii) intended to make conservative investments and, (iii) would have never knowingly bought any long term bonds, regardless of the interest rate, as it was always looking only to acquire short term instruments, because ARS are typically not now liquid.

32.    Perhaps the best evidence that USH intended to buy short term instruments and not long term bonds is that each of the securities recommended by DeBasio and bought by USH, and which turned out to be ARS, carried with it an interest rate of only .25 or .50 basis points greater than then existing money market rates, which made the ARS appear to be short instruments, combined with the fact that they were traded on a near weekly or monthly basis.  Further, at the time of the auction market failure in February 2008, virtually 100% of USH's available cash was invested in ARS.  USH would have never knowingly tied up all of its free cash by purchasing 20 year or longer bonds for such a nominal return, especially given its conservative cash management philosophy emphasizing liquidity.

33.    At no time ever, prior to any of the foregoing purchases, did SunTrust provide USH with any prospectus or written descriptive document describing these investments and their

inherent risks.  Further, at no time ever did USH place an order with DeBasio to purchase a long term bond, nor did USH ever knowingly buy a long term bond.

34.     Further, SunTrust never sent USH confirmation slips that described these investments as being long term and potentially illiquid ARS.  In fact, the majority of weekly statements provided by SunTrust to USH consistently refer to the ARS purchased for it as being 35 day instruments.  Thus, no documents tendered by SunTrust or STRH put USH on notice that these securities, which performed as liquid, short term cash instruments or notes, were indeed long term illiquid ARS.  Even more remarkable is that to this day, approaching two years after the ARS auction market which traded these ARS collapsed, SunTrust still sends USH monthly securities statements that do not accurately describe the full nature of ARS securities.

35.     At the time that each of the securities referenced above in paragraph 30 were purchased, USH believed each such instrument was acquired consistent with USH's conservative established investment criteria described above, based upon: (a) the purchase conversation between Bond and DeBasio where DeBasio counseled USH on what to buy, (b) the confirmation trading slips and periodic reports that followed, and (c) that for an extended period, these ARS were bought and sold on a roughly weekly basis.

36.     USH was required to and for the duration of the relationship, did provide SunTrust with annual audited financial statements.  In those financial statements, USH classified securities (which were ARS) as short term cash equivalents, not long term securities.  SunTrust received these financial statements as part of the USH loan covenants and never questioned, or more important, corrected USH as having improperly classified the securities, therefore, effectively validating that the ARS were short term liquid securities.  At any time, had SunTrust so notified

19

USH, it would have been alerted to the true nature of the ARS, and could have acted to mitigate its loss.

37.     USH is presently holding $14,800,000 face value of the following ARS purchased for it by SunTrust: (i) South Carolina Student Assistance Authority, (ii) Vermont State Student Assistance Corp., (iii) Michigan Student Loan, (iv) North Carolina State Educational Assistance Authority, (v) North Carolina State Educational Assistance Authority (sometimes collectively, "USH's ARS").  As to each of these ARS, SunTrust purchased them for USH prior and during the collapse of the ARS auction market as specifically itemized in paragraph 30 above.  DeBasio sold these specific ARS to USH advising that they were not only short term investments, but also, extremely safe investments since they were effectively student loans and backed by the full faith and credit of the federal government.

38.     Thereafter, until the ARS market collapsed in February 2008, DeBasio, acting on behalf of SunTrust, continued to sell ARS to USH under the same procedures as described above.  In fact, on the very day the auction market collapsed, February 12, 2008, DeBasio rolled over $9.7 million of USH's ARS without advising USH that there was a problem with the auction market.  In fact, immediately prior to these very last rollovers, DeBasio even told Bond that he saw some things going on in the bond marketplace, but that USH should not be concerned.  Worse, after SunTrust sold hundreds of millions of dollars worth of ARS to its clients, including a significant amount to USH, on or about February 13, 2008, SunTrust simply stopped participating in the ARS auctions and, as widely reported, the auction market then permanently failed.

39.     As a result of SunTrust's withdrawal from the auction market, USH, who thought it was holding highly liquid short term notes, found itself saddled with long term bonds it cannot

sell, and USH did not learn this until it was too late, being after the auction market failure.  And now, as of the filing of this Amended Complaint, USH has no prospect of selling its ARS, since the auction market no longer even exists. USH's only opportunity to sell its ARS, if at all, is at a steep discount from par value.

40.     Thus, in connection with USH's intent to rescind all of its ARS purchases made by SunTrust, USH hereby proffers a tender of the $14,800,000 face value ARS that it is holding to SunTrust.  Further, USH reserves the right to liquidate these ARS and seek damages against SunTrust for the difference in the amount received compared to the original purchase price of the ARS, plus special and/or consequential damages.

### USH IS ENTITLED TO SPECIAL DAMAGES AND PUNITIVE DAMAGES

41.     USH has been damaged in other ways besides holding $14,800,000 in illiquid ARS, which apparently have to be written down pursuant to FASB accounting standards and presently have little or no real cash value.  USH also has suffered special damage by: (a) incurring additional expenses on the purchase of the Warrenton foundry, because it did not have free cash to make the acquisition and financing same did not appear to be economically feasible; (b) expense incurred in having to buy back the Industrial Revenue Bonds referenced above; (c) lost investment income and/or opportunities from not having access to its $14,800,000; (d) transaction costs in having to change banks; (e) the actual higher market rate of interest for long term bonds that USH should have been paid, instead of the much lower interest rate payable on its $14,800,000 worth of ARS.

42.     Notably, in addition, at no time did SunTrust or STRH ever provide to USH, by trade confirmation slips, monthly statements or any other document, the slightest information as to any fees earned and/or commissions paid to SunTrust, STRH and/or DeBasio for the purchase

and sale of any and all of USH's ARS.  USH is informed and believes this was a systematic approach by SunTrust to hide from all of its clients the significant profit SunTrust or STRH was making by its active participation in the ARS market.  USH believes this profit motive also serves as material proof of SunTrust acting to benefit itself, rather than for the interests of its clients, including USH to whom it owed a fiduciary duty.  Given the inequitable circumstances of SunTrust and/or STRH receiving commissions, or some other type of undisclosed fees for improperly and illegally selling ARS, USH submits it is entitled to an accounting of all fees or commissions paid to SunTrust and STRH from the time it started buying ARS for USH, and a refund of all such sums received by SunTrust and/or STRH as a matter of unjust enrichment.  It is unconscionable that SunTrust or STRH should profit even a penny from any USH ARS transaction.

43.     Particularly disturbing about USH getting stuck holding ARS after the auction market failed in February 2008, is that SunTrust had numerous other customers who purchased ARS prior to February 2008, and SunTrust liquidated those customers' ARS positions before the auction market crashed.  USH learned this fact in a post-February 2008 meeting with Robert Reich ("Reich"), an Investment Officer with SunTrust's Private Wealth Management Department, about the personal securities portfolio of Alex DeBogory, Jr., USH's CEO, which SunTrust was managing, as referenced above.  During this meeting, Reich first confirmed that Mr. DeBogory had no ARS in his portfolio.  David Brunswick then asked Reich if SunTrust had any clients invested in ARS and Reich responded in the affirmative.  Brunswick next asked what happened to these clients and Reich indicated that he had gotten all of the SunTrust clients out of ARS before the market crashed.  Reich was then asked how he knew to do that, and he

responded, "We (SunTrust) saw the crash coming, so we got everyone out."  Obviously, however, not everyone, since SunTrust left USH behind in breach of their fiduciary duty.

44.     Further, as referenced above, SunTrust never provided a single prospectus or written descriptive material about ARS prior to any USH ARS purchase.  The fact that SunTrust never provided USH with a prospectus or descriptive materials about ARS imposes both: (i) a heightened degree of responsibility to assess against SunTrust for accurately describing to USH the ARS and its risks prior to selling them; and (ii) an even greater obligation on SunTrust to use its best efforts to liquidate USH's ARS prior to the auction market failing, since USH was in no position to understand that the ARS were long term bonds and the existence of and ARS actual auction market conditions.  Thus, failing to accurately counsel USH on what ARS really were and the inherent risks prior to their purchase, and then failing to warn, advise or liquidate USH's ARS positions prior to the auction market failure, which SunTrust knew was impending, is evidence of SunTrust's bad faith and willful and wanton conduct, warranting an award of punitive damages.

45.     Further, at all relevant times going back to 2001, SunTrust failed to provide adequate instruction or compliance training about ARS to its employees, including DeBasio.  As a result, DeBasio lacked even a rudimentary understanding about ARS and how the ARS auction market functioned.  Instead, DeBasio received the most minimal amount of information about ARS, including totally insufficient and incomplete sales materials produced by SunTrust management with directives to sell ARS, resulting in DeBasio representing to USH that ARS were equivalent to cash or money market funds and were safe, highly liquid short-term investment vehicles.  Effectively, SunTrust either intentionally or through gross negligence misinformed DeBasio that in reality, ARS were illiquid, long term ARS bonds that would not be

marketable or capable of being liquidated in the event of an auction market failure. This course of conduct occurred for at least a 7 year period and is evidence of SunTrust's willful and wanton misconduct, warranting an award of punitive damages.

46.     Additional evidence of SunTrust's bad faith and willful and wanton misconduct stems from its post-auction market crash conversations with USH. Rather than working with USH to figure out how to appropriately liquidate USH's ARS, SunTrust repetitively lied to USH about ARS market conditions. First, once the auction market ceased to exist in February 2008, neither DeBasio nor anyone from SunTrust advised USH of that fact. Then, after the national press started covering the ARS auction market failure and USH contacted DeBasio to ask questions about the situation, DeBasio said the auction market failure was a short term issue that would last a maximum of three months. However, at about the three month mark, DeBasio then stretched the time for resolution of the ARS market to roughly six months, then again after that approximately, to nine months. The reality was that SunTrust knew the ARS auction market was permanently closed as of February 2008, because SunTrust was one of the issuer banks that walked away from the auction market with no intention of getting back in, proven by the fact that SunTrust liquidated both much of its own and other clients' ARS, starting perhaps as early as July 2007, and SunTrust never took any steps to revitalize the ARS auction market again after February 2008.

47.     Aside from SunTrust's overt misrepresentations to USH about the ARS being short term liquid notes instead of long term illiquid notes; SunTrust also failed to disclose to USH its role in helping to create, then propping up, manipulating, misrepresenting and then abandoning the ARS auction market after it protected itself and select other clients. This conduct supports an award of punitive damages.

24

48.     As bad, USH was forced to file this lawsuit even though the SEC has already found SunTrust committed fraudulent practices in connection with its sale of ARS and participation in the auction process. In an Administrative Proceeding ruling dated May 31, 2006, the SEC found that certain broker-dealers including SunTrust Capital Markets, Inc. ("STCM"), the predecessor to STRH, engaged in various illegal practices in order to make it appear that the auctions were successful and legitimate when, in fact, they were not.  So even though the SEC sanctioned SunTrust for its illegal conduct related to ARS in May 2006, SunTrust continued on with the same illegal conduct after that date, all the way up to February 2008, when the ARS auction market finally failed.   This willful and wanton conduct also supports an award of punitive damages.

49.     Further, SunTrust has essentially already admitted its wrongdoing in a settlement with FINRA on ARS fraud claims, which it admitted in various of its public filings, then withdrew that settlement in bad faith.

50.     Astonishingly, even now, long after the ARS auction market crashed, SunTrust and STRH continue to misrepresent the status of ARS and the auction market.  Starting around August 2007, which by no coincidence is when the first significant ARS auction failure occurred, STRH inserted at the bottom of trade confirmation slips an innocuous legend stating, "A full written description of SunTrust Robinson Humphrey, Inc's material auction practices and procedures is available on the firm's webpage at https://www.suntrustrh.com.  However, when going to that web link, it does not lead to any such disclosure document, but rather, just to a general web page for STRH.   Serious hunting on that webpage is required, and then buried within that webpage is another link titled, "Financial and Regulatory Disclosures," which takes one to yet another link, titled, "Auction Rate Securities Practices."   Notably, even though the

auction market ceased to exist 20 months preceding the filing of this lawsuit, and even though SunTrust and STRH know and have known for at least 8 years that ARS were and are not short term instruments, this document serves as irrefutable proof that USH was lied to when purchasing its ARS, because to this day, SunTrust and STRH continue to falsely describe ARS on its website:

> "Auction Rate Securities are municipal bonds, corporate bonds, or preferred stocks with interest rates that are periodically re-set through auctions, typically every 7, 14, 28 or 35 days.  Auction Rate Securities are attractive to issuers as an alternative variable rate financing vehicle, and to investors as an alternative to money market funds and other short-term high grade investments."

This statement validates the facts pled above as to DeBasio advising USH that the securities he was selling were short term, liquid, cash equivalents.

## COUNT I
## FOR BREACH OF FIDUCIARY DUTY

51.     USH repeats and realleges paragraphs 1 through 50 as if fully set forth herein.

52.     SunTrust owed USH a fiduciary duty, as pled in great detail above.

53.     SunTrust has breached the fiduciary duty it owed to USH by its commission of the following acts:

> (a)     Despite both knowing USH's conservative cash management corporate planning strategies and related investment philosophy with conservation of cash, SunTrust continually and systematically induced USH to purchase ARS, although they were diametrically opposite of USH's investment objectives and what was suitable to USH's business interests.

(b)     Misrepresenting the securities SunTrust was selling to USH, as being highly liquid, 7 to 35 day notes, when in fact, the securities were long-term illiquid ARS bonds, with no free market for resale.

(c)     Failing to disclose to USH the true nature of ARS, their inherent risks and its related auction market, by failing to ever provide a prospectus or other descriptive document prior to selling USH any ARS.

(d)     Misrepresenting to USH the true nature of the ARS being sold to USH, by failing to accurately identify their maturity date on any trade confirmation slip, weekly statement, monthly statement, a practice that continues to this day.

(e)     Failing to disclose to USH commissions or fees that SunTrust was making on each purchase and sale of ARS on behalf of USH.

(f)     Failing to advise USH that SunTrust was materially involved as a trading participant in and propping up the ARS auction market, such that its mere involvement served as a conflict of interest as against USH's interests, since SunTrust was necessarily was placing itself ahead of USH.

(g)     Failing to advise USH anything about the ARS Dutch auction process and how it worked.

(h)      Withdrawing its support from the ARS market and contributing to its collapse, without advising USH prior thereto, while in conflict of interest, liquidating SunTrust's own ARS positions and those of other preferred SunTrust clients, while leaving USH behind.

27

(i)     Even after the ARS auction market failed, SunTrust continued to falsely advise USH that the auction market was going to return soon, suggesting that USH possibly would be able to liquidate its ARS, rather than telling USH the truth that the auction market would never return.

(j)     By failing to take any steps to assist USH in liquidating its ARS, or to handle the liquidity problems created at USH, notwithstanding SunTrust's knowledge that that it wrongly sold USH ARS to begin with, and that USH was severely damaged by being forced to hold the ARS after the auction market failed.

(k)     By failing to train DeBasio about ARS, or alternatively, to supervise him respecting his management of USH's investment account.

54.     At all times material hereto, DeBasio was an authorized agent of SunTrust and STRH, binding them both by his actions.   Further, to the extent DeBasio later became an STRH employee, STRH was at all times acting as an agent on behalf of SunTrust as to all illegal acts related to the sale of ARS.

55.     As a result of the foregoing breaches of fiduciary duty committed against USH by SunTrust and STRH, USH has suffered actual and special damages.

56.     USH further seeks an award of punitive damages against SunTrust and STRH based upon its willful and malicious conduct orchestrated for a period of about 7 years against USH.  This course of conduct comprised not just one instance of willful and malicious conduct, but as stated above, comprised an ongoing and systematic pattern of at least 10 separate acts as described above, any of which would independently support an award of punitive damages, the cumulative effect of which demonstrates extremely egregious behavior.

WHEREFORE, Plaintiff USH asks for judgment in its favor and against defendants SunTrust and STRH for damages, including special damages and punitive damages, pre-judgment interest and for all such other relief as the court deems just and appropriate.

## COUNT II
## FOR NEGLIGENCE

57.     USH repeats and realleges paragraphs 1 through 50 as if fully set forth herein.

58.     In serving as USH's investment adviser and broker, SunTrust and then later, STRH acting through DeBasio, owed USH a duty of care to recommend and make investments on behalf of USH in a prudent manner and in conformity with USH's investment criteria guidelines, as pled in great detail above.  The facts pled above with respect to establishing the existence of a fiduciary duty owed by defendants are similarly relevant to establishing the separate negligence duty of care owed to USH.

59.     Defendants have breached the duty of care they owed to USH by their commission of the following acts:

(a)     Despite knowing USH's conservative cash management corporate planning strategies and related investment philosophy with conserving its cash, SunTrust and then STRH continually and systematically induced USH to purchase ARS, although they were diametrically opposite of USH's intents and what was beneficial to USH's business interests.

(b)     Misrepresenting the securities being sold to USH, as being highly liquid, 7 to 35 day notes, when in fact, the securities were long-term illiquid ARS bonds, with no market for resale.

(c)     Failing to disclose to USH the true nature of what ARS were and their related auction market risks, by failing to ever provide a prospectus or other descriptive document prior to selling USH any ARS.

(d)     Misrepresenting to USH the true nature of the ARS being sold to USH, by failing to ever accurately identify their maturity date on any trade confirmation slip, weekly statement, monthly statement, a practice that continues to this day.

(e)     Failing to disclose to USH commissions or fees that SunTrust and STRH were making on each purchase and sale of ARS on behalf of USH.

(f)     Failing to advise USH that SunTrust was materially involved as a trading participant in and propping up the ARS auction market, such that its mere involvement served as a conflict of interest as against USH's interests, since SunTrust was necessarily was placing itself ahead of USH.

(g)     Failing to advise USH anything about the ARS Dutch auction process and how it worked.

(h)      Withdrawing its support from the ARS market and participating in its collapse, without advising USH prior thereto, while in conflict of interest, liquidating SunTrust's own ARS positions and those of other preferred SunTrust clients.

(i)     Even after the ARS auction market failed, SunTrust continued to falsely advise USH that the auction market was going to return soon, suggesting that USH possibly would be able to liquidate its ARS, rather than telling USH the truth that the auction market would never return.

30

(j)     By failing to take any steps to assist USH in liquidating its ARS, or resolving the liquidity problem caused by SunTrust, notwithstanding SunTrust's knowledge that that it wrongly sold USH ARS to begin with, and that USH was severely damaged by being forced to hold the ARS after the auction market failed.

(k)     Both Defendants failed to adequately train DeBasio about ARS and the ARS auction market, or alternatively, both Defendants failed to properly supervise DeBasio respecting his management of USH's investment account.

60.     At all times material hereto, DeBasio was an authorized agent of SunTrust and STRH, binding them both by his actions.   Further, to the extent DeBasio later became an STRH employee, STRH was at all times acting as an authorized agent of and on behalf of SunTrust as to all illegal acts related to the sale of ARS.

61.     As a result of the foregoing negligent acts committed against USH by SunTrust, USH has suffered actual and special damages.

62.     USH further seeks an award of punitive damages against SunTrust based upon its willful and malicious conduct orchestrated for a period of about 7 years against USH.  This course of conduct comprised not just one instance of willful and malicious conduct, but as stated above, comprised an ongoing and systematic pattern of at least 10 separate acts as described above, any of which would independently support an award of punitive damages, the cumulative effect of which demonstrates extremely egregious behavior.

WHEREFORE, Plaintiff USH asks for judgment in its favor and against defendants SunTrust and STRH for damages, including special damages and punitive damages, pre-judgment interest and for all such other relief as the court deems just and appropriate.

**COUNT III**
**FOR FRAUD IN THE INDUCEMENT**

63.     USH repeats and realleges paragraphs 1 through 17 and 22 through 50 as if fully set forth herein.

64.     In connection with serving as USH's investment advisor and broker, SunTrust committed the following misrepresentations or omissions of material fact in connection with causing USH to purchase the ARS identified in paragraph 30 above:

(a)     Misrepresenting the securities being sold to USH, as being highly liquid, 7 to 35 day notes, when in fact, the securities were long-term illiquid ARS bonds.

(b)     Failing to disclose to USH the true nature of what ARS was and its related auction market, by failing to ever provide a prospectus or other descriptive document prior to selling USH any ARS.

(c)     Misrepresenting to USH the true nature of the ARS being sold to USH, by failing to accurately identify their maturity date on trade confirmation slips, weekly statements, monthly statements; a practice that continues to this day.

(d)     Failing to disclose to USH commissions or fees that SunTrust and STRH was going to and did charge or collect on each purchase and sale of ARS on behalf of USH.

(e)     Failing to disclose to USH that SunTrust was materially involved as a trading participant in and propping up the ARS auction market, such that its mere involvement served as a conflict of interest as against USH's interests, since SunTrust was necessarily was placing itself ahead of USH.

65.     Each of the foregoing misrepresentations or omissions of material fact occurred with the intent of SunTrust and later, by STRH when DeBasio became an STRH employee, to induce USH to purchase ARS securities.

66.     As to each of the foregoing misrepresentations of material fact, they were made with the specific intent and actual knowledge of either their falsity, or in reckless disregard of same, to induce USH to purchase ARS securities.

67.     As to each of the foregoing omissions of material fact, they were not disclosed to USH with the specific intent and actual knowledge of either their falsity, or in reckless disregard of same, to induce USH to purchase ARS securities.

68.     Each of the foregoing misrepresentations or omissions occurred on a regular and continuous basis commencing from the time of USH's first purchase of ARS in or about 2001, through the date of its last purchase of ARS in February 2008.

69.     USH reasonably relied to its detriment on the representations and omissions of SunTrust and later STRH, when purchasing ARS.

70.     At all times material hereto, DeBasio was an authorized agent of SunTrust and STRH, binding them both by his actions.   Further, to the extent DeBasio later became an STRH employee, STRH was at all times acting as an agent of and controlled by SunTrust as to all illegal acts related to the sale of ARS.   Further, USH is informed and believes that all misrepresentations made by DeBasio or omissions that should have been forthcoming from him,

resulted from the actions of presently unknown senior officers of SunTrust and/or STRH who knew the true nature of ARS and the ARS auction process and failed to disclose same to DeBasio.  Nonetheless, DeBasio was the front line communicator with USH and the authorized agent for SunTrust and later, STRH, and regardless had a duty to speak the full and complete truth to USH at all times.

71.    As a direct and proximate result of the result of the foregoing misrepresentations and omissions committed against USH by SunTrust and STRH, USH has suffered actual and special damages.

72.    USH further seeks an award of punitive damages against SunTrust and STRH based upon its willful and malicious conduct orchestrated against USH.  This course of conduct comprised not just one instance of willful and malicious conduct, but as stated above, comprised an ongoing and systematic pattern of at least 10 separate acts as described above, any of which would independently support an award of punitive damages, the cumulative effect of which demonstrates extremely egregious behavior.

WHEREFORE, Plaintiff USH asks for judgment in its favor and against defendants SunTrust and STRH, jointly and severally, for damages, including special damages and punitive damages, pre-judgment interest and for all such other relief as the court deems just and appropriate.

**COUNT IV**
**FOR UNJUST ENRICHMENT**

73.    USH repeats and realleges paragraphs 1 through 17 and 22 through 40 as if fully set forth herein.

74.    USH conferred a benefit upon SunTrust by placing all its accounts, banking business and investments with SunTrust, expecting in return and that in furtherance of the

fiduciary duty owed by SunTrust to USH as pled above, that SunTrust would act honorably. This was particularly important as to SunTrust handling USH's securities accounts and in investing USH's money, especially with SunTrust expressly knowing USH's conservative cash management and investment philosophies.

75.   SunTrust and STRH have accepted that benefit and SunTrust has acknowledged the fiduciary duty it owed to USH, both publicly in its Code of Business Conduct and in its *Solaris* magazine, and by the fact that it assumed such significant responsibility over and infused itself so deeply into USH's financial matters, including managing USH's free cash in its securities accounts.

76.   SunTrust and STRH benefitted in an extremely material financial way, not just by all of the fees it charged and collected for services provided to USH, but more specifically as to this claim, in the form of nondisclosed fees, profits and or commissions that SunTrust and STRH earned at USH's expense while SunTrust was fraudulently selling ARS to USH.

77.   It is inequitable to allow SunTrust to retain any sums of money it received in connection with selling ARS to USH, whether those monies comprise commissions or non-disclosed fees, because one way or the other, USH was paying those fees.

78.   USH lacks an adequate remedy at law.

WHEREFORE, Plaintiff USH asks for judgment in its favor and against defendants SunTrust and STRH, jointly and severally, for damages equaling all fees or commissions earned for every transaction where it purchased or sold an ARS for USH, plus pre-judgment interest and all such other relief as the court deems just and appropriate.

**COUNT V**
**FOR VIOLATION OF FLORIDA STATUTE §517.301**

79.    USH repeats and realleges paragraphs 1 through 17 and 22 through 50 as if fully set forth herein.

80.    In connection with the rendering of investment advice by SunTrust and later, by STRH, and further, in connection with the offer, sale and purchase of securities bought and sold by SunTrust and STRH to USH, Defendants committed various acts that constituted employing a device, scheme or artifice to defraud USH under Fla. Stat. §517.301(1)(a)(1), and further, such acts consisted of engaging in transactions, practices and/or a course of dealing which operated as a fraud upon USH under Fla.Stat. §517.301(1)(a)(3).

81.    These actions did: (i) deceive USH; (ii) enable Defendants to sell billions of dollars of ARS, on which SunTrust made substantial fees; (iii) enable Defendants to sustain an artificial market, and conceal failures of auctions, for ARS sold by SunTrust; (iv) enable Defendants to manipulate the interest rates for ARS sold by SunTrust; (v) cause USH to purchase overvalued ARS sold by SunTrust; and (vi) cause USH damages when the undisclosed risks with ARS materialized.

82.    SunTrust and STRH, individually and in concert, directly and indirectly, by the use, mean or instrumentalities of interstate commerce and/or of the mails, engaged and participated in this comprehensive scheme to defraud and a continuous course of conduct to conceal adverse material information about ARS sold directly or indirectly by SunTrust.

83.    SunTrust and STRH were aware of the true facts surrounding the ARS sold by them, as well as their obligation to provide such information to USH because, as set forth in SEC Administrative Proceeding Release 33-8684, 34-53888 dated May 31, 2006, STRH was censured, fined $125,000, ordered to cease and desist from various practices regarding ARS, and

ordered to provide its holders of ARS with descriptions of STRH's auction practices and procedures. The SEC found that STRH committed the following violations: "completion of open or market bids, intervention in auctions, bids to prevent failed auctions, bids to set a "market" rate, bids to prevent all-hold auctions, prioritization of bids, submission or revision of bids after deadlines, allocation of securities, partial orders, express or tacit understandings to provide higher returns and price talk."

84.    Despite knowing USH's conservative cash management corporate planning strategies and related investment philosophy with its conservation of cash, SunTrust continually and systematically misrepresented the securities SunTrust, then later STRH was selling to USH, telling USH it was buying highly liquid, 7 to 35 day notes, when in fact, the securities were long term illiquid ARS bonds.

85.    USH has now come to learn that ARS are corporate or public bonds, with a long-term maturity for which the interest rate was regularly reset through a Dutch auction, typically every 7, 14, 28 or 35 days.  In the Dutch auction process, broker-dealers submitted bids on behalf of potential buyers and sellers of ARS. Based on the submitted bids, the auction agent set the interest rate to match supply and demand.  This process was propped up by the brokers benefitting from their sale, and which provided for the weekly trading of these securities that made them appear to be short term instruments.

86.    SunTrust systematically hid from USH the true nature of the ARS sold to USH, first by not providing a prospectus or other descriptive document on any ARS purchase, and second, by failing to accurately identify the maturity date of the ARS on any trade confirmation slip, weekly statement, monthly statement, a practice that continues to this day.

87.     SunTrust systematically failed to disclose to USH that there were hidden commissions or fees that SunTrust was making on each purchase and sale of ARS on behalf of USH for its own benefit, the result of which was that USH effectively paid all of such commissions or fees, without knowing they were built into the cost of the ARS.

88.     SunTrust failed to advise USH that SunTrust was materially involved as a trading participant of ARS and was actively involved in propping up the ARS auction market, including failing to advise USH anything about the ARS Dutch auction process and how it worked, so as to hide from USH the tremendous profits it was making on its own ARS, as well as nondisclosed commissions and fees on not just USH ARS transactions, but those of all of SunTrust's other clients as well.

89.     Sun Trust also failed to disclose to USH that ARS were only "liquid" because they and other broker-dealers created an artificial market for ARS which would dry up as soon as these broker-dealers decided to remove themselves from the auction process.  SunTrust further failed to disclose that it participated in the auctions and purchased ARS for its own accounts to avert auction failures, and that the ARS market was fragile with substantial liquidity risks.

90.     At the same time that SunTrust was continuing to sell ARS to USH, SunTrust withdrew its support from the ARS market, allowing it to collapse, without advising USH prior thereto, or taking any action to liquidate USH's ARS, although SunTrust liquidated its own ARS positions and those of other preferred SunTrust clients to the detriment of USH, who remains a holder of ARS to this day.

91.     Even after the ARS auction market failed, SunTrust and STRH continued to falsely advise USH that the auction market was going to return soon, rather than telling USH the truth that the auction market would never return.

92.    SunTrust failed to disclose material facts relating to its conduct in the auctions, including the scope and extent to which it intervened in the auctions. In addition, SunTrust manipulated the auctions for ARS by routinely intervening in auctions to prevent auction failures and to influence the rates of interest (or dividends) paid on these ARS.

93.    As referenced above, SunTrust was subject to certain SEC administrative proceedings related to SunTrust's role in the ARS auction process.  The SEC found SunTrust rearranged bids through "netting" of in-house buy and sell orders ahead of actual auctions in order to change the priority of bids. Before submitting bids to the auction agent, SunTrust changed or "prioritized" their customers' bids to increase the likelihood that the bids would be filled. As a result of this prioritization and a similar practice known as "cross-trading," certain bids were moved up in the disclosed hierarchy by which different types of bids would be filled. In certain instances, these practices resulted in certain investors' bids displacing other investors' bids when the auction was oversubscribed, affected the clearing rate, and did not conform to disclosed procedures.

94.    The SEC also found rampant submission or revision of bids after deadlines. As described above, most auctions had an internal deadline-that broker-dealers set' for investors to submit bids to the broker-dealers and a formal submission deadline set by the offering documents for broker-dealers to submit bids to the auction agent. Broker-dealers allowed certain investors to submit or revise bids after these deadlines. In addition, the broker-dealers themselves submitted or revised bids after these deadlines. These practices advantaged certain ARS investors of SunTrust who bid after a deadline by displacing other investors' bids, affected the clearing rate, and did not conform to disclosed procedures.

95.    The SEC also found that broker-dealers collaborated with certain customers by asking them to bid at auctions and then compensating them with higher-than-clearing rates in the secondary market. For example, pursuant to an express or tacit understanding reached prior to or during an auction: (1) certain broker-dealers provided a higher return by having the investor submit its bid at a lower rate than the investor actually wanted to receive, allowing the auction to clear at the lower rate, buying the securities from the investor after the auction, and then selling the securities back to the investor at below par value; (2) certain broker-dealers simply displaced an investor's bid and then compensated the investor by selling securities to the investor at below par value in the secondary market; and (3) certain broker-dealers provided a higher return by delaying the settlement date for certain investors.

96.    The SEC's findings demonstrated that the ARS auctions were often auctions in name only and allowed broker-dealers and/or their preferred customers to earn the best interest rates and manipulate the ARS market.  As a result, 15 broker dealers, including SunTrust Capital Markets, Inc., were fined $13 million, censured by the SEC and ordered to "cease and desist" from these practices in the future.  Notably, SunTrust's illegal conduct did not stop, however, as the facts pled in this Complaint demonstrate SunTrust continued with illegal conduct for many months after the auction market failed in February 2008.

97.    USH has been damaged as a result of SunTrust's illegal acts, as described above.

WHEREFORE, USH seeks rescission damages as provided under Fla. Stat.§517.211, as well as its attorneys fees as the prevailing party as also awardable pursuant to said statute.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: May 17, 2010.                    Respectfully submitted,

                                        BERGER SINGERMAN
                                        Attorneys for Plaintiff, U.S. Holdings, Inc.
                                        350 East Las Olas Boulevard, Suite 1000
                                        Fort Lauderdale, FL  33301
                                        Main:  (954) 525-9900
                                        Direct: (954) 712-5138
                                        Fax:    (954) 523-2872


                                        By: ___*s/Charles H. Lichtman*_____
                                                Charles H. Lichtman, Esq.
                                                Florida Bar No. 501050
                                                clichtman@bergersingerman.com
                                                Fred O. Goldberg
                                                Florida Bar No. 0898619
                                                fgoldberg@bergersingerman.com
                                                Samuel Cozzo
                                                Florida Bar No. 0012541
                                                scozzo@bergersingerman.com




## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via CM/ECF this 17th day of May, 2010.

                            *By: _s/Charles H. Lichtman*_____
                                    Charles H. Lichtman, Esq.

## SERVICE LIST

United States District Court for the Southern District of Florida
*U.S. Holdings, Inc. v. Suntrust Bank, and Suntrust Robinson Humphrey, Inc.*
CASE NO. 09-CV-23222-MOORE-SIMONTON

Charles H. Lichtman, Florida Bar No. 501050
CLichtman@bergersingerman.com
Fred Goldberg, Esq., Florida Bar No. 898619
fgoldberg@bergersingerman.com
BERGER SINGERMAN
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, FL 33301
Telephone: (954) 525-9900
Facsimile: (954) 523-2872

*Counsel for Plaintiff U.S. Holdings, Inc.*
***(via transmission of Notices of Electronic
Filing generated by CM/ECF***

Oscar A. Sanchez, Esq., Florida Bar No. 363138
Oscar.sanchez@akerman.com
Michael O. Mena, Esq., Florida Bar No. 010664
Michael.mena@akerman.com
AKERMAN SENTERFITT
One Southeast Third Avenue
25th Floor
Miami, FL 33131
Telephone: (305) 374-5600
Facsimile: (305) 374-5095

*Counsel for Defendants SunTrust Bank and
SunTrust Robinson Humphrey, Inc.*
***(via transmission of Notices of Electronic
Filing generated by CM/ECF)***

David Tetrick, Jr., Florida Bar No. 097500
dtetrick@kslaw.com
KING & SPALDING, LLP
1180 Peachtree St., NE
Atlanta, GA 30309
Telephone: (404) 472-4600
Facsimile: (404) 572-5100

*Counsel for Defendants
SunTrust Banks, Inc. and
SunTrust Robinson Humphrey, Inc.*
***(via transmission of Notices of Electronic
Filing generated by CM/ECF)***

Cory Hohnbaum, Esq.
chombaum@kslaw.com
KING & SPALDING, LLP
227 West Trade Street, Suite 600
Charlotte, NC 28202
Telephone: (704) 503-2561

*Counsel for Defendants
SunTrust Banks, Inc. and
SunTrust Robinson Humphrey, Inc.*
***(via transmission of Notices of Electronic
Filing generated by CM/ECF)***

Michael O. Mena, Esq.
michael.mena@akerman.com
AKERMAN SENTERFITT
One Southeast Third Avenue, 25th Floor
Miami, FL 33131
Telephone: (305) 374-5600
Facsimile: (305) 374-5095

*Counsel for Defendants
SunTrust Banks, Inc. and
SunTrust Robinson Humphrey, Inc.*
***(via transmission of Notices of Electronic
Filing generated by CM/ECF)***

Bethany M. Rezek, Esq.
brezek@kslaw.com
KING& SPALDING, LLP
1180 Peachtree Street NE
Atlanta, GA 30309-3521
Telephone: (404)572-4600
Facsimile (404) 572-5139

*Counsel for Defendants
SunTrust Banks, Inc. and
SunTrust Robinson Humphrey, Inc.*
***(via transmission of Notices of Electronic
Filing generated by CM/ECF)***

2812130-2